STATE, EX REL. FRANK J. KOBES ET AL., APPELLANTS, V. JAMES J. GRIMM ET AL., APPELLEES.

FILED FEBRUARY 14, 1927. No. 25678.

1. Elections: CANVASSING BOARD: DUTIES MINISTERIAL. The duties of an election canvassing board are purely ministerial.

2. ———: ———: ———. An election canvassing board is not clothed with judicial power.

3. ———: DIRECTORY PROVISIONS OF STATUTE. The provisions of of a statute which affect the mode and manner of conducting the mere details of an election are directory.

4. ———: CANVASSING BOARD: REFUSAL TO ACT. The refusal of a majority of an election canvassing board to perform a duty imposed by law shall not be permitted to disfranchise the citizens whose votes are thereby rejected.

5. Statutes: CONSTRUCTION. Where a statute requires an official act to be done by a given day, for a public purpose, it must be construed as merely directory in regard to the time of performance.

APPEAL from the district court for Saline county: LEWIS H. BLACKLEDGE, JUDGE. *Reversed, with directions.*

*John E. Mekota* and *Thomas J. Dredla,* for appellants.

*Bartos, Bartos & Placek, Robert R. Hastings* and *Grant G. Martin, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

State, ex rel. Kobes, v. Grimm.

DEAN, J.

A special election was held in Saline county to determine whether $175,000 in bonds of the county should be issued for the erection of a county courthouse. Joseph M. Korbel, the county clerk, and James J. Grimm, and Robert R. Hastings were the duly qualified and acting members of the county canvassing board. The controversy here, under circumstances to which reference is hereinafter made, has to do with the rejection, by a majority of the board, of two certain ward tally lists, namely, those in respect of the vote cast in the first ward and the third ward in the city of Crete, "and what effect ought to be given to them," as noted by an agreement of the parties before the trial commenced.

Frank J. Kobes and Ralph M. Pflasterer are qualified residents, taxpayers and electors of the first and third wards of Crete, respectively. As relators they began this suit in mandamus to compel the respondents to reassemble in their official capacity and canvass, and to include in the official returns, the tally lists of the votes cast in the two Crete wards in question. The court denied the writ and the relators appealed.

The special election was held June 4, 1926. June 10 the canvassing board met, but adjourned until June 14, to await the arrival of the mail vote, and on that date the canvassing board met and finally canvassed all returns except those from the first and third wards of Crete. And in respect of the returns from these two wards, other than that they were finally rejected, the official action of the board, in the present state of the record, is not altogether clear. It does appear, however, that two members of the canvassing board finally determined that the tally lists of the first and third wards of Crete should not be included in the final returns. But the tally lists of both these wards were in the hands of the canvassing board June 15 and June 18, respectively.

It appears from Hasting's evidence that, on June 14, county clerk Korbel produced such election boxes of the

various voting precincts as had been returned, and on that day the board adjourned until 1:30 in the afternoon of June 15, to the end that Hastings, as a member of the canvassing board, might go to Crete for the missing tally lists. He made the trip and returned with the first ward tally list. Thereupon the board reconvened at the courthouse, and Grimm, upon examination, informed the board that the tally list from the first ward in Crete seemed to be properly certified, and added: "We might just as well canvass this return." The tally list of the first ward, which is attached to the record, shows that 16 votes were cast for the courthouse bonds and that 646 votes were cast against the bonds. Mr. Hastings also testified that on or about the noon hour of June 18, after having made a second trip to Crete, he returned with the tally list of the third ward and filed it in the office of the county clerk, and that he then informed Grimm of the fact, and that Grimm replied that, by advice of counsel, he doubted if he would canvass them. But Grimm went with Hastings to the courthouse and on arrival there both Korbel and Grimm refused to join Hastings in a canvass of the tally lists of the omitted wards then on file. Hastings further testified that he, as a board member, insisted that the first and third wards be canvassed "along with the rest" and duly certified, and he subsequently filed a separate and individual return. And it appears from Hastings' evidence that the election returns submitted by Korbel and Grimm were filed in the afternoon of June 18, a little more than an hour after he, Hastings, returned from Crete with the tally list of the third ward and after it had been filed with the county clerk. It appears, too, that county clerk Korbel placed the numerals, which he later erased, that showed the number of votes cast in the third ward in a column after the number of votes cast. This tally list shows 9 votes for the bonds in the third ward and 723 votes against the bonds.

James J. Grimm testified on the part of the respondents. On the cross-examination his evidence discloses the follow-

ing material facts: "Judge, you did canvass the votes of the first ward that day? A. On the 15th (of June) we did; yes, sir. * * * Q. And you signed it as members of the canvassing board, didn't you, Judge? A. Yes, sir. * * * Q. Those votes were canvassed just as much as any ward in the precinct, weren't they, at that time? A. I rather think that they would be considered so; yes, sir." Grimm's evidence also discloses that after the meeting of June 10 the board adjourned to June 14, and on that date, without a formal adjournment, the board "gave Mr. Hastings time in which to get the (Crete) returns." And it also appears that on June 18 the tally list of the third ward of Crete was brought in by Hastings and on that day the board held a meeting. Grimm further testified: "Q. And you looked at these tally lists that were brought in? A. I did. Q. And after that, then what did you do? A. Well, we simply declined to canvass, that is all. Q. Then after that what did you do? A. Adjourned. Q. You adjourned after you had seen those and it had been presented to your board for canvass? A. Yes, sir."

It may here be observed that the canvassing board once, during its session, included the first ward tally list in its proposed return of the tally lists then in its hands. But the record shows that Korbel and Grimm, as members of the board, reconsidered their action and, over the protest of Hastings, its action in respect of the return of this tally list was rescinded.

In the language of the decree of the learned trial court, "there is no intimation here that there has been any intentional wrong-doing shown." "There is no substantial dispute in the evidence as to the facts out of which this case arises; no fraud appears or is charged in it and none has been proved or attempted."

Under the count disclosed by the omission of the tally lists for the first and third wards in Crete, as contended for by respondents, the total vote for the bonds was 3,561 and against the bonds the vote was 2,511, making a majority,

under that enumeration of 1,050 for the issuance of the bonds. Under the enumeration contended for by the relators, which includes the first and third wards of Crete, 3,586 votes were cast for the issuance of the bonds and 3,879 votes were cast against the issuance of the bonds, making a majority, under this enumeration of 293 votes against the adoption of the courthouse bond proposition. From a consideration of the facts it clearly appears to us that the tally lists of the first and third wards should have been included in the returns made by the canvassing board.

It must be conceded, as pointed out by the decree of the district court, that neither intentional wrong-doing nor fraud appears on the part of the election canvassing board. And in our decision we merely hold that the refusal of a majority of the board to perform a duty imposed by law shall not be permitted to disfranchise the citizens whose votes were rejected.

A review of the record does not disclose a trace of dishonesty or intentional wrong-doing on the part of any member of the county canvassing board. And it is unthinkable that the citizen who casts an honest vote shall be deprived of his franchise solely by the negligence, or the indifference, of a county canvassing board or by the application of a technical rule of practice by the court. To have his vote fairly counted for the candidate or for the proposition for which his vote was regularly cast is a sacred heritage of the citizen and, from the earliest beginning of our country, this has been heralded as one of the safeguards of American liberty.

It is elementary that the duties of an election canvassing board are purely ministerial. *Long v. State,* 17 Neb. 60. An election canvassing board is without judicial power and may be compelled by mandamus to perform its ministerial duty. *Hagge v. State,* 10 Neb. 51; *State v. Dinsmore,* 5 Neb. 145. "In determining the effect of irregularities due to the mistake of election officers, it should be remembered that all statutes tending to limit the citizen in the

exercise of the right of suffrage are to be construed liberally in his favor." 9 R. C. L. 1092, sec. 102. The provisions of a statute which affect the mode and manner of conducting the mere details of an election are directory and the will of the majority is to be respected even when irregularly expressed. The electors are not to suffer on account of the default of their agents. McCrary, Elections (4th ed.) sec. 228.

In connection with the rule above pointed out, it may be observed that county clerk Korbel's cross-examination very frankly disclosed that the first and third ward tally lists from Crete were both filed in his office before the board finally adjourned, and that there was nothing "on the face of those tally lists to make them irregular," and no evidence of any change of the marking that was originally made, and that they refused to canvass them "just because they were presented out of time and by Mr. Hastings, one of the members of the board, instead of one of the officers of the election at Crete." McCrary in his work, above cited, at section 282, says:

"In general, where a statute requires an official act to be done by a given day, for a public purpose, it must be construed as merely directory in regard to the time. Accordingly, it is uniformly held that a statute requiring an officer or board to certify the result of an election, or in any way to make known the result, or to issue a commission on or before a given day, or within a given number of days after the election, is directory and not mandatory. Such acts are valid though performed after the expiration of the time. This doctrine has been uniformly maintained by the courts, and nothing is better settled."

The same author, in section 269, observes that, where an election board has improperly adjourned without performing its duties, it may be compelled by mandamus to reassemble and complete its work. And in the same paragraph an opinion by Judge Brewer is cited, wherein the learned jurist declares that a refusal by an election canvassing

board to canvass a part of the returns is equivalent to a refusal to canvass any of the returns. And the opinion goes so far as to point out that, even though the board has adjourned *sine die*, mandamus will lie to compel appropriate action on the part of the board.

Respondents have directed our attention to other features of the case which we do not discuss because, in view of the facts and the authorities, we do not think they are material.

The judgment is reversed and the cause is remanded, with directions that the writ of mandamus be granted as prayed by the relators, and that the election canvassing board be required by the district court to reconvene, forthwith, in an official capacity and complete the canvass in accordance with the views herein expressed by including the tally lists from the first and third wards of the city of Crete with their returns as required by law.

REVERSED.